**In the Matter of GREENSBORO LUMBER COMPANY,**
**Debtor.**

**Bankruptcy No. 90–30905.**

United States Bankruptcy Court,
M.D. Georgia,
Athens Division.

Aug. 19, 1993.

---

Frank A. Lightmas, Jr., Atlanta, GA, for Greensboro Lumber Co.

James I. Roberts, Washington, GA, for Rayle Elec. Membership Corp.

Joy Webster, Office of U.S. Trustee, Macon, GA, for U.S. Trustee.

### MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

Rayle Electric Membership Corporation ("Rayle Electric") filed a motion for authority to set off on July 17, 1992. Greensboro Lumber Company, Debtor, filed its "Motion for Turn Over of Property of the Estate" on November 23, 1992. A hearing on both motions was held on February 11, 1993. The Court, having considered the evidence presented and the arguments and briefs of counsel, now publishes this memorandum opinion.

Rayle Electric is a rural electric membership cooperative organized under the Georgia Electric Membership Corporation Act (the "Act").[1] Rayle Electric is in the business of supplying electricity to its patrons.[2] Rayle Electric is operated as a nonprofit organization in accordance with its Bylaws, the Act,[3] and the Internal Revenue Code.[4] At the end of each fiscal year,[5] Rayle Electric is obligated to pay into a capital account any excess revenues generated by Rayle Electric's operations. These payments to the capital account are known as patronage capital credits ("capital credits") and are allocated to each patron. No interest or dividends are paid on capital credits. Rayle Electric's board of directors may re-

---

1. O.C.G.A. § 46–3–170 (1992).

2. Patron is the name given to members or customers of Rayle Electric.

3. O.C.G.A. § 46–3–340(a) (1992).

4. I.R.C. § 501(c)(12) (1993).

5. Rayle's fiscal year begins on January 1 and ends on December 31 of each year. *Rayle Electric Membership Corporation, Bylaws,* Article VII, Section 7.03.

tire capital credits if the financial condition of Rayle Electric is not impaired. Retirement means that monetary payment is made to the patron.

A capital credit is reflected as equity on Rayle Electric's business records until its board of directors votes to retire the capital credit. At that time, the capital credit becomes an account payable, which is a liability.

Rayle Electric is indebted to the Rural Electrification Administration ("REA"). REA requires that Rayle Electric have an equity level of forty percent before Rayle Electric can freely distribute capital credits to patrons. Rayle Electric's equity level was 40.7 percent on December 31, 1991.

Rayle Electric's Bylaws provide:

### ARTICLE VI

### NON–PROFIT OPERATION

**6.01 Non–Profit Operation.** The Cooperative shall at all times be operated on a cooperative non-profit basis for the mutual benefit of its patrons.

**6.02 Patronage Capital in Connection with Furnishing Electric Energy— Receipt.** In the furnishing of electric energy the Cooperative's operation shall be so conducted that all patrons will, through their patronage, furnish capital for the Cooperative. In order to induce patronage and to assure that the Cooperative will operate on a non-profit basis, the Cooperative is obligated to account on a patronage basis to all its patrons for all amounts received and receivable from the furnishing of electric energy in excess of operating costs and expenses properly chargeable against the furnishing of electric energy. All such amounts in excess of operating costs and expenses at the moment of receipt by the Cooperative are received with the understanding that they are furnished by the patrons as capital. No interest or dividend shall be paid or be payable by the Cooperative on any capital furnished by its patrons.

**6.03 Patronage Capital—Accounts.** The Cooperative is obligated to pay by credits to a capital account for each patron [or patron's estate][6] all such amounts in excess of operating costs and expense. The books and records of the Cooperative shall be set up and kept in such a manner that at the end of each fiscal year the amount of capital, if any, so furnished by each patron is clearly reflected and credited in an appropriate record to the capital account of each patron. The Cooperative shall, within a reasonable time after the close of the fiscal year, notify each patron by notification to all patrons of the aggregate amount of such excess with an explanation of how each patron may compute and determine for himself the specific amount of capital so credited to him. Notwithstanding any other provision of these Bylaws to the contrary, the Board of Directors, at its discretion, may allocate capital credits for an individual member or class of members based upon rates, costs-of-service for that member or that class.

**6.04 Patronage Capital–Status as Such.** All such amounts credited to the capital account of any patron shall have the same status as though they had been paid to the patron in cash in pursuance of a legal obligation to do so and the patron had then furnished the Cooperative corresponding amounts of capital.

**6.05 Other Patronage Capital—Allocation.** All other amounts received by the Cooperative from its operation in excess of costs and expenses shall, insofar as permitted by law, be:

(a) Used to offset any losses incurred during the current or any prior fiscal year; and

(b) To the extent not needed for that purpose, allocated to its patronage on a patronage basis and any amount so allocated shall be included as a part of the capital credited to the accounts of the patrons as herein provided.

**6.06 Patronage Capital From Other Organizations.** Notwithstanding any

6. This addition became effective in August of 1991.

other provision of these Bylaws, the Board shall have the power to adopt rules providing for the separate accounting for and procedure for the retirement of such other amounts of capital credited to the accounts of patrons, which correspond to capital credited to the account of the Cooperative by other organizations in which the Cooperative is a member. Such rules shall among other things:

(a) Establish a method for determining portions of such capital credited to each of the Cooperative's patrons for each applicable fiscal year.

(b) Provide for the separate identification thereof for each patron on the Cooperative books.

(c) Provide for appropriate notification thereof to patrons.

(d) Preclude a general or special retirement thereof prior to actual receipt of such capital by the Cooperative.

**6.07 Patronage Capital—Dissolution.** In the event of dissolution or liquidation of the Cooperative, after:

(a) All debts and liabilities of the Cooperative shall have been paid; and

(b) All capital furnished through patronage shall have been retired as provided in these Bylaws.

(c) The remaining property and assets of the Cooperative shall be distributed among members and former members on a patronage basis.

**6.08 Patronage Capital—Distribution Prior to Dissolution.** If at any time prior to dissolution or liquidation the Board of Directors shall determine that the financial condition of the Cooperative will not be impaired thereby, the capital then credited to patrons' accounts may be retired in full or in part. [In no event, however, may such capital be retired unless, after the proposed retirement, the capital of the Cooperative shall equal at least forty percent (40%) of the total assets of the Cooperative].[7]

[**6.09 Patronage Capital—Distribution to Estates or Representatives of Deceased Members.** Notwithstanding any other provision of these Bylaws, the Board of Directors, at its discretion, shall have the power, upon the death of any natural patron, if the legal representatives of his estate shall request in writing that the capital credited to any such patron be retired prior to the time such capital would otherwise be retired under the provisions of these Bylaws, to retire capital credited to any such patron immediately upon such terms and conditions as the Board of Directors, acting under policies of general application and the legal representatives of such patron's estate shall agree upon; provided, however, that the financial condition of the Cooperative will not be impaired thereby.][8]

**6.10 Patronage Capital—Assignment.** Capital credited to the account of each patron shall be assignable only on the books of the Cooperative pursuant to written instruction from the assignor and only to successors in interest or successors in occupancy in all or part of such patron's premises served by the Cooperative unless the Board of Directors acting under policies of general application shall determine otherwise.

**6.11 Patronage Capital—Right of Setoff.** If a member or a patron should terminate his or her membership in the Cooperative, either voluntarily, or if said membership is terminated by action of the Board of Directors or by the members at a membership meeting, and at the time of such termination the member or patron is indebted to the Cooperative for non-payment of any debt or obligation, which may include electric service, penalties, and/or other fees and services rendered as provided for in the policies of the Cooperative, the Cooperative may, at the time of the retirement of said capital credit, charge the same to the capital credit account of the member or patron and debit the member's or pa-

---

7. The last sentence of section 6.08 was deleted in August of 1991.

8. Section 6.09 was "deemed superfluous and unnecessary" and was deleted in August of 1991.

tron's capital credit account in the amount and credit the same to the member's or patron's delinquent and unpaid account.

**6.12 Patronage Capital Contract with Member.** The patrons of the Cooperative, by dealing with the Cooperative, acknowledge that the terms and provisions of the Articles of Incorporation and Bylaws shall constitute and be a contract between the Cooperative and each patron, and both the Cooperative and the patrons are bound by such contract as fully as though each patron had individually signed a separate instrument containing such terms and provisions.

*Rayle Electric Membership Cooperative, Bylaws,* Article VI.

Rayle Electric paid credits into Debtor's capital account for the years 1966 through 1990. These capital credits total $91,-628.09. Rayle Electric retires capital credits on a twenty-five-year basis. That is to say, a capital credit is retired twenty-five years after credits are paid into the capital account. Thus, a patron does not receive monetary payment until twenty-five years after capital credits are paid into the patron's capital account. In April of 1992, when Debtor's Chapter 11 case was pending, Rayle Electric authorized the retirement of capital credits for the years 1966 and 1967. Capital credits for those two years have been paid to all patrons except for Debtor. Debtor's capital credits for 1966 and 1967 total $5,769.77. Rayle Electric has not authorized the retirement of capital credits for 1968 and subsequent years.

Debtor filed a petition under Chapter 11 of the Bankruptcy Code on November 5, 1990. Debtor is indebted to Rayle Electric in the amount of $35,754.47 for prepetition electric service. Debtor is liquidating its assets and will not reorganize as a going concern.

Debtor asks the Court to order Rayle Electric to turn over its capital credits in the amount of $91,628.09. Rayle Electric asks for authority to use Debtor's 1966 and

1967 capital credits of $5,769.77 to set off a portion of Debtor's prepetition debt of $35,-754.47. Rayle Electric does not seek to set off Debtor's capital credits for 1968 and subsequent years until Rayle Electric's board of directors retires those capital credits.

Section 553(a) of the Bankruptcy Code [9] provides, in part:

**§ 553. Setoff**

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

11 U.S.C.A. § 553(a) (West 1993).

■ "A pre-petition setoff is valid as long as it complies with the state law governing a creditor's right to setoff and with the requirements of section 553 of the Bankruptcy Code." *Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.),* 940 F.2d 1507, 1512 (11th Cir.1991).

"In order to defeat a debtor's action for turnover, however, the burden is on the creditor to establish a valid right of setoff under section 553." *Pester Refining Co. v. Mapco Gas Products, Inc. (In re Pester Refining Co.),* 845 F.2d 1476, 1486 (8th Cir.1988).

■ To assert a right of setoff, Rayle Electric must prove that:

(1) Rayle Electric has a claim against Debtor that arose before the bankruptcy filing;

(2) Rayle Electric owes a debt to Debtor that arose before the bankruptcy filing; and

(3) The claim and the debt are mutual obligations.

*See United States v. Johnson (In re Johnson),* 136 B.R. 306, 308–09 (Bankr.M.D.Ga. 1991).

**9.** 11 U.S.C.A. § 553(a) (West 1993).

There is no dispute that the first requirement has been met. Rayle Electric's claim against Debtor for unpaid electric service arose prepetition. Debtor contends the second and third requirements have not been met. Debtor contends a capital credit is not a prepetition debt.

In *Howard v. Eatonton Co-operative Feed Co.,*[10] Howard, a farmer, purchased feed from the Eatonton Co-operative.[11] Howard received patronage allocations from the Eatonton Co-operative. Howard wanted to set off his patronage allocations against the feed bill he owed. The Georgia Supreme Court denied this request and stated:

(a) This ruling is controlling adversely as to the defendants' contentions that the assets of the feed division were held in trust by the creamery and hence were not subject to assignment.

2. Among the assets of the feed division of the creamery which were assigned to the plaintiff were the accounts owed by the defendants, which the plaintiff now seeks to collect, and patronage allocations or "equities" credited to the defendants for purchases made by them, which the defendants contend should be allowed as a setoff against their accounts payable and any excess be paid to them.

Such position of the defendants is not maintainable.

Redemption of patronage allocations is a matter within the discretion of the directors of the cooperative. It is well established that "equity credits allocated to a patron on the books of a cooperative do not reflect an indebtedness which is presently due and payable by the cooperative to such patron. Such equity credits represent patronage dividends which the board of directors of a cooperative, acting under statutory authority so to do, has elected to allocate to its patrons, not in cash or other medium of payment, which would immediately take such funds out of the working capital of the cooperative, but in such manner as to provide or retain capital for the cooperative and at the same time reflect the ownership interest of the patron in such retained capital. Equity credits are not an indebtedness of a cooperative which is presently due and payable to the members, but represent an interest which will be paid to them at some unspecified later date to be determined by the board of directors. Therefore, *equity credits cannot be used as a setoff against a member's present indebtedness to the association."* 18 Am.Jur.2d 275, Co-operative Associations, § 15.

Here, the evidence is uncontradicted that no determination has been made by the directors of the plaintiff to redeem the revolving fund certificates which represent the defendants' patronage allocations or equities, and therefore they are not entitled to set off such equities against their accounts payable or payment over to them of any excess amount of such equities.

177 S.E.2d at 662 (emphasis added).

In *Georgia Turkey Farms, Inc. v. Hardigree,*[12] Georgia Turkey Farms was a cooperative marketing association of which Hardigree was a member at the time of his death. Hardigree's widow demanded immediate and full payment of Hardigree's interest in the cooperative. The Georgia Court of Appeals denied this demand and stated:

It was noted by the North Dakota Supreme Court in regard to a similar provision, "that the patronage credits constitute an interest of the patron in the cooperative which is contingent and not immediately payable. This interest becomes vested only when the board of directors, in the exercise of its sound discretion, determines that such payment can be made in cash without causing undue financial hardship to the coopera-

---

10. 226 Ga. 788, 177 S.E.2d 658 (1970).

11. Howard actually purchased feed from a predecessor of Eatonton Co-operative. This does not affect the Court's decision.

12. 187 Ga.App. 200, 369 S.E.2d 803 (1988).

tive. It is difficult to see why the death of a member would automatically cause his interest to vest. This would be in clear violation of the principle behind the law relating to cooperative associations, that the vesting of such interest should be the result of a positive declaration by the board of directors, acting in the exercise of its discretion, determining when such interest should vest. The board surely would have the authority, if the financial condition of the cooperative warranted such action, to declare such interest due as of the date of a member's death. However, the board cannot be compelled to jeopardize the financial status of the cooperative by being forced to make such payment, as a matter of law, on the death of any member." (Indention omitted.) *Evanenko v. Farmers Union Elevator*, supra [191 N.W.2d 258] at 261, 262 [N.D.1971].

We agree that the estate's vested interest in Hardigree's equity credits did not include any vested right to patronage redemption at a time other than in the sole discretion and sound business judgment of the board of directors, as no statute or pre-existing bylaw or contractual right required otherwise. See 18 Am Jur 2d, Cooperative Assns., § 14 (1985 ed.).

369 S.E.2d at 807.

It is clear that under Georgia law, "equity credits cannot be used as a setoff against a member's present indebtedness to the association." *Howard*, 177 S.E.2d at 662.

■ Rayle Electric asserts "Rayle's ability to set off debt owed with capital credits only extends to the credits retired until such time as the entire debt is expired, and setoff cannot be accelerated just as retirement of capital credits cannot be accellerated [sic]." Simply stated, Rayle Electric cannot set off a patron's debt with capital credits which have not been retired. In addition, retirement of a capital credit cannot be accelerated in order to set off a patron's delinquent debt.

13. 96 B.R. 161 (Bankr.C.D.Ill.1988).

■ Under its Bylaws, Rayle Electric has a right of setoff *after* a patron's membership is terminated, "at the time of the retirement of said capital credit." *See Rayle Electric Membership Cooperative, Bylaws,* Article VI, Section 6.11 *Patronage Capital—Right of Setoff.* The Bylaws do not provide a right of setoff until a patron's membership is terminated and the capital credit is retired. Rayle Electric has not shown that Debtor's membership was terminated and its capital credits retired before the filing of Debtor's bankruptcy case.

In *Taylor v. Assumption Cooperative Grain Co. (In re Beck)*,[13] the bankruptcy court stated:

The Debtor's patronage earnings account reflects, in this Court's view, an ownership interest in the Coop rather than a debt due and owing. The debt arises, if at all, at the point at which the Coop becomes obligated to redeem the account. In this case, no demand to redeem the account was made before the bankruptcy petition was filed; consequently, no "mutual debt" arose before the commencement of the case, and Sec. 553 does not apply. Hence, the Coop is not entitled to setoff.

96 B.R. at 163.

The Court is persuaded that for purposes of section 553(a), the capital credits at issue were not debts owed by Rayle Electric when Debtor filed its bankruptcy case. It was while Debtor's Chapter 11 bankruptcy case was pending that Rayle Electric's directors authorized the retirement of the capital credits for 1966 and 1967. *See In re F.L.F. Farmers Co-operative Assoc., Inc.,* 170 F.Supp. 497 (D.N.J.1958) (patronage capital fund did not give rise to a claim in bankruptcy); *In re Eastern Maine Electric Cooperative, Inc.,* 125 B.R. 329, 339 (Bankr.D.Me.1991) (allocated patronage capital the directors have not voted to retire remains an ownership interest and not an unsecured claim).

The Court is persuaded that Rayle Electric's motion for authority to set off must be denied. Rayle Electric's directors have elected to retire capital credits for the years 1966 and 1967. Payment has been made to all patrons except Debtor. The Court is persuaded that Rayle Electric should now make payment to Debtor for the 1966 and 1967 capital credits.

The Court now turns to Debtor's request for an order requiring Rayle Electric to turn over capital credits for the years 1969 through 1990. These capital credits have not been retired. Section 542(a) of the Bankruptcy Code[14] provides:

> **§ 542. Turnover of property to the estate**
>
> **(a)** Except as provided in subsection (c) and (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C.A. § 542(a) (West 1993).

■ The capital credits are property of Debtor's bankruptcy estate. *Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149, 1153 (4th Cir. 1988); *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989); *In re Beck*, 96 B.R. at 163; *Nelson v. Cavalier Rural Electric Co–Operative of Langdon, ND (In re Axvig)*, 68 B.R. 910, 916–17 (Bankr.N.D.1987).

Joseph Randolph Nichols is a certified public accountant who represents Rayle Electric and about thirty other electric membership cooperatives. Mr. Nichols testified that Rayle Electric's Bylaws neither authorize nor prohibit a special retirement of all capital credits to Debtor. A special retirement is a retirement made of a particular patron's capital credits rather than for all patrons of the electric membership cooperative. Mr. Nichols testified that a special retirement could adversely affect Rayle Electric's tax exempt status under the Internal Revenue Service regulations. Mr. Nichols testified that Rayle Electric is in "average financial condition." Mr. Nichols understands that Rayle Electric has never made a special retirement upon the death of a patron.

Debtor asserts four reasons to support its demand that Rayle Electric immediately retire Debtor's capital credits for the years 1969 through 1990. First, Debtor contends that its "liquidation should be treated the same way Rayle [Electric] treats the death of a natural patron." Debtor contends that "[t]o retire the capital credits of deceased natural patrons, while at the same time refusing to retire the capital credits of other patrons who are essentially dead is no longer authorized under Rayle [Electric's] own bylaws."

Debtor relies upon *In re Great Plains Royalty Corp.*,[15] in which the issue was stated as follows:

> We here consider whether two REA-financed cooperatives, operating under bylaw policies of general application, may decline to refund patronage capital credited to the estate of a bankrupt and defunct corporation *when* it would refund such capital to the estate of an individual patron should he die.

471 F.2d at 1262 (emphasis added).

The circuit court continued, stating:

> Where no financial impairment will result, the bylaws permit an exception by allowing ... early retirement of a patron's credits upon his death, where the board of directors in its discretion and "acting under policies of general application * * * " approves.

> With this background, we turn briefly to the record here. It shows that both [cooperatives] are in sound financial condition and that *each has consistently authorized prepayment of capital cred-*

**14.** 11 U.S.C.A. § 542(a) (West 1993).

**15.** 471 F.2d 1261 (8th Cir.1973).

*its to the estates of individual patrons who have died over the past decade.*

471 F.2d at 1263 (emphasis added).

Finally, the circuit court stated:

The bylaws of each cooperative, in this case, specify that their terms constitute a contract between the cooperative and each patron. The discretion granted the directors in accelerating retirement of capital credits upon the death of any patron must be exercised under policies of general application. *Yet the undisputed record shows that both [cooperatives] in recent years have accelerated payment of capital credits upon the death of an individual patron while denying similar treatment to a corporation which has dissolved or become bankrupt.* Of course a corporation does not die in the organic sense, but it can cease to exist. The bylaw speaks in terms of the "death of any patron." In implementing this bylaw and denying accelerated payment of capital credits to defunct corporations which are "de facto dead," the cooperatives have, in effect, granted individual patrons a preference over corporate patrons in the liquidation of capital credits. Such a preference violates both . the statutory proscription against discrimination between patrons in the payment of patronage refunds, N.D.Cent.Code § 10–15–33(4)(b), and the bylaw requirement that such refunds be administered according to "policies of general application."

. . . .

For the purpose of accelerating refund of capital credits, we believe the estate of such a corporation to be entitled to the same treatment as that given to the estate of an individual patron who dies. Accordingly, the cooperative bylaw provision here in question permitting retire-

ment of capital credits on the "death of any patron" must be construed to apply to the claims of the trustee of the bankrupt corporation against each cooperative.

471 F.2d at 1264–65 (emphasis added).

■ Turning to the case at bar, Debtor has failed to show that Rayle Electric has ever approved special retirement of capital credits upon a natural patron's death. Georgia law allows, but does not require, special retirement for a deceased *natural* patron.[16] No such provision is made for a dissolved corporation. The Court is persuaded that Debtor cannot prevail under this contention.

Second, Debtor contends the Court has authority to require special retirement of capital credits under section 1123(a)(5)(D) of the Bankruptcy Code,[17] which provides:

§ 1123. **Contents of plan**

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

. . . .

(5) provide adequate means for the plan's implementation, such as—

. . . .

(D) sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate;

11 U.S.C.A. § 1123(a)(5)(D) (West 1993).

Debtor relies on *Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.).*[18] In that case, Universal was a nonprofit agricultural cooperative. FCX, Inc. was a patron which purchased supplies from Universal. Universal held a first lien on patronage certificates as security for any in-

---

**16.** O.C.G.A. § 46–3–341(a) (1992). This section provides:

**46–3–341. Return of revenues upon death of member.**

(a) Unless the bylaws otherwise provide, upon the death of a member or former member who is a natural person, the board of directors shall have authority, but shall not be required, to pay revenues allocated but not

previously paid to that member or former member.

O.C.G.A. § 46–3–341(a) (1992).

**17.** 11 U.S.C.A. § 1123(a)(5)(D) (West 1993).

**18.** 853 F.2d 1149 (4th Cir.1988). *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989).

debtedness of the patron to Universal. Universal's board of directors had discretionary right to set off a patron's indebtedness against the patron's patronage certificates. The patron did not have a corresponding right to require that setoff be made. When FCX, Inc. filed its Chapter 11 bankruptcy case, it held unredeemed patronage certificates in the amount of $1.1 million. FCX, Inc. wanted to abandon a portion of its patronage certificates in full satisfaction of Universal's secured claim in the amount of $658,000. Universal objected, asserting that its board of directors had sole and absolute discretion to redeem or set off a patron's indebtedness. The Fourth Circuit Court of Appeals ruled in favor of FCX, Inc. and stated:

> Because "Congress may ... abrogate state law entitlements in bankruptcy pursuant to its Bankruptcy Clause Power, U.S. Const. art. I, § 8, cl. 4," *In re Farmers Markets*, 792 F.2d at 1403, we must ask further whether there exists any conflicting bankruptcy law which overrides the discretionary power over the redemption of the patronage certificates vested in Universal's board by state law and its by-laws. FCX here contends that § 1123(a)(5)(D) preempts the restrictive provisions of Universal's by-laws and allows it to release the patronage certificates in satisfaction of Universal's claim.
>
> Section 1123(a)(5)(D) provides, among other things, for the distribution of collateral which is property of the estate to a party holding a security interest in the collateral in satisfaction of that party's secured claim.... By its plain language then, § 1123(a)(5)(D) overrides nonbankruptcy law restrictions on the distribution of collateral to satisfy a claim secured by the same. Accordingly, § 1123(a)(5)(D) supersedes the discretionary power over surrender of the patronage certificates bestowed on Universal's board by its by-laws.
>
> ....
>
> ... [W]e believe that the bankruptcy court had the authority to authorize FCX to surrender patronage certificates in satisfaction of Universal's secured claim. 853 F.2d at 1154–1155.

Section 1123(a)(5)(D) allows a Chapter 11 debtor to implement a reorganization plan (1) by the sale of all or part of property of the bankruptcy estate either subject to or free of any lien, or (2) by the distribution of all or part of property of the bankruptcy estate among those having an interest in said property.

■ Debtor does not propose to sell its capital credits. Thus, the first part of the statement above is not applicable. In *In re FCX, Inc.*, Universal held a lien on the debtor's patronage certificates. Thus, it held an interest in property of the bankruptcy estate. In the case at bar, Rayle Electric does not hold a lien on Debtor's patronage capital credits. The Court is persuaded that *In re FCX, Inc.* is distinguishable. The Court is persuaded that section 1123(a)(5)(D) is not applicable to the issue before the Court.

■ Third, Debtor contends its capital credits should be retired because its membership has been terminated. Debtor asserts, "By continuing to hold onto the capital credits, Rayle [Electric] is forcing [Debtor] to maintain an equity or ownership interest in a cooperative in which it is no longer a member and from which it has been terminated." Debtor cites no legal authority for this position. The Court notes that Rayle Electric's Bylaws allow for the assignment of capital credits. *Rayle Electric Membership Corporation, Bylaws*, Article VI, Section 6.10 *Patronage Capital–Assignment*. The Court notes, without deciding, that Debtor may be able to sell its capital credits under section 1123(a)(5)(D) of the Bankruptcy Code. The Court is not persuaded that Debtor has demonstrated entitlement to relief under this third contention.

■ Finally, Debtor contends the refusal of Rayle Electric to retire the capital credits is arbitrary and capricious. Debtor asserts three reasons to support this contention. First, Debtor contends Rayle Electric has sufficient funds to retire its capital

credits and that retirement would not have an adverse economic impact on Rayle Electric. The Court is not persuaded that financial ability is sufficient to require a special retirement of capital credits.

Second, Debtor contends Rayle Electric retires capital credits when a natural patron dies and should retire capital credits when a non-natural patron ceases operation. Debtor has not shown that Rayle Electric has ever authorized early retirement for a deceased natural patron.

Finally, Debtor contends the failure to retire the capital credits will create administrative nightmares in this bankruptcy case. Debtor, however, may be able to assign or sell its capital credits and receive payment of some discounted sum.

The Court is persuaded that Debtor's motion for turn over of capital credits for 1968 through 1990 must be denied.